UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-142(3) (DSD/KMM)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **GOVERNMENT'S** |
| | ) | **CONSOLIDATED RESPONSE TO** |
| v. | ) | **DEFENDANT JABERIAN'S** |
| | ) | **PRETRIAL MOTIONS** |
| SAIED JABERIAN, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, W. Anders Folk, Acting United States Attorney for the District of Minnesota, and Joseph H. Thompson and Miranda E. Dugi, Assistant United States Attorneys, submits the following consolidated response to defendant's pretrial motions.

## I.   BACKGROUND

### A.   The Shell Hijacking Scheme

Defendant Saied Jaberian participated in a scheme to hijack and assume control over dormant public shell companies and use that control to fraudulently manipulate the price of the company stock so that the conspirators could profit from the sale of stock at fraudulently inflated and "pumped up" prices.

As part of the scheme, the conspirators identified dormant public shell companies—that is, publicly traded companies without active operations that have stopped filing their required Securities and Exchange Commission (SEC) and secretary of state filings. These dormant public shell companies traded publicly on the over-the-counter (OTC) stock market, generally for fractions of a penny per share.

1

Miller and his co-conspirators then bought stock in the dormant public shell companies at low prices in the OTC market. They were able to obtain hundreds of thousands or even millions of shares because the stocks traded at only a fraction of a penny per share.

After buying stock in the dormant public shell companies, Jaberian and his co-conspirators hijacked and took control over the companies by creating and filing fake resignation letters and board minutes purporting to announce the resignation of the prior corporate officers and the appointment of one or more of the conspirators as new officers and board members. They used these fake documents to gain access to and control over the companies' accounts with the SEC's Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system, which allowed them to make public filings on behalf of the hijacked companies.

Jaberian and his co-conspirators used his control over the hijacked shell companies to issue fraudulent press releases and public filings designed to fraudulently inflate and "pump up" the price of the hijacked companies' stock.

Finally, Jaberian and his co-conspirators sold or "dumped" their stock at the fraudulently inflated and pumped-up stock prices to unsuspecting investors.

The conspirators hijacked a number of public shell companies, including Bell Buckle Holdings Inc. (OTC: BLLB), Digitiliti Inc. (OTC: DIGI), Encompass Holdings Inc. (OTC: ECMH), and Utilicraft Aerospace Industries Inc. (OTC: UITA).

### B.    Bell Buckle Holdings Inc. (OTC: BLLB)

One of the companies Jaberian and his co-conspirators hijacked was Bell Buckle Holdings Inc., a dormant public shell company that traded under the symbol

BLLB. Jaberian and his co-conspirators used their control over the company to fraudulently manipulate and pump up the price of the company's stock so that they and others could profit from the sale of stock at fraudulently inflated prices to unwitting investors. As explained below, Jaberian participated in the hijacking of Bell Buckle Holdings by fraudulently posing as its CEO. Jaberian then used his "authority" to fraudulently obtain access to the company's SEC account, and issue fraudulently SEC filings and press releases on behalf of the company.

Jaberian and his co-defendants hijacked Bell Buckle Holdings in February-March 2018. On February 20, 2018, defendant Mark Miller drafted fake board minutes that falsely purported to accept the resignation of the President and CEO of Bell Buckle Holdings. The minutes also purported to appoint Jaberian as the new President and CEO. These documents were fraudulent. The prior CEO had not resigned, and Jaberian was not actually being appointed as President and CEO of Bell Buckle Holdings.

Jaberian and his co-conspirators then began buying shares of BLLB stock. Collectively, they purchased more than 60 million shares of BLLB stock over the five-day period from February 22 to 26, 2018. For his part, Jaberian purchased approximately 20.5 million shares of BLLB.

After they had acquired millions of shares at BLLB stock for fractions of a penny per share, Miller and Jaberian submitted an application to obtain the passphrase allowing them to access the company's EDGAR account. Jaberian posed as the President and CEO of the company in order to access the EDGAR account.

They used their fraudulently obtained control of the company's EDGAR account to file an SEC Form 8-K falsely announcing the resignation of the former CEO of Bell Buckle Holdings and Jaberian's appointment as CEO and sole director.

Jaberian and his co-conspirators then drafted and issued a press release announcing—falsely—that Jaberian had been appointed as CEO of Bell Buckle Holdings. The press release falsely described the company as "a new emerging Import/Export business in the U.S. with a long history of Bulk Leather Sales in the European and Middle-Eastern Markets." The press release falsely claimed that Jaberian had been "an Importer/Exporter for the past 35 years operating a family owned business, which was established in 1958" and that his company had been involved in bulk leather sales "to the Ports of Salerno, Italy and Izmir, Turkey." None of this was true. In reality, Jaberian is a real estate broker and owner of a Fantastic Sam's discount hair salon in Hopkins, Minnesota. Jaberian knew Miller from prior real estate transactions. Nevertheless, Jaberian and his co-conspirators issued the false press release in order to fraudulently pump up the price of BLLB stock.

This release, and the public announcement of a new management team, caused the price of BLLB to spike. Jaberian and his co-conspirators took advantage of the fraudulently manipulated and inflated stock price by selling or "dumping" their stock after they had fraudulently inflated the stock price through their fraudulent press releases and internet postings. Jaberian, for example, sold his 20.5 million shares of BLLB stock between February 28 and March 5, 2018, for a return of approximately 350 percent in less than two weeks.

4

### C.     The Charges

On June 16, 2021, a grand jury returned a 15-count indictment against Jaberian and two co-defendants, Mark Miller and Christopher Rajkaran. Dkt. #1. The indictment charges Jaberian with one count of conspiracy to commit securities fraud, four counts of securities fraud, and five counts of wire fraud.

## II.    DEFENDANT'S DISCOVERY MOTIONS

Defendant has filed several general discovery motions. These motions appear to be of the boilerplate variety and do not relate to any ongoing disputes regarding the government's discovery.

### A.     Motion to Compel Affirmance or Denial of Unlawful Acts (Dkt. #49)

Defendant Jaberian has moved for an order compelling the government to affirm or deny the use of any illegal surveillance during its investigation. He has not identified any specific evidence that he believes was obtained illegally and the government did not conduct any illegal surveillance during the investigation. Accordingly, his motion should be denied.

### B.     Motion to Compel Production of Brady Materials (Dkt. ##50-51)

Defendant has moved for disclosure of exculpatory, favorable, and impeaching information under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). The government understands, has substantially complied with, and will continue to comply with, its *Brady* and *Giglio* obligations to produce exculpatory/impeachment evidence to the defense. If any additional such evidence

comes to the government's attention, it will be turned over promptly, and sufficiently before trial to enable the defendant to make effective use of it.

### C.   Motion for Disclosure and Inspection Pursuant to Rule 16 (Dkt. #52)

Jaberian moves the court for an order requiring the government to provide discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure. The government does not oppose defendant's motions insofar as they comport with the requirements of Rule 16(a)(1). The government has already made its Rule 16 disclosures and will continue to supplement those disclosures when and if additional materials are acquired. The government, however, objects to any discovery order that exceeds the requirements of Rule 16. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case"); *United States v. Johnson*, 228 F.3d 920, 924 (8th Cir. 2000) ("Criminal defendants do not have a general constitutional right to discovery. In most circumstances, then, a defendant must point to a statute, rule of criminal procedure, or other entitlement to obtain discovery from the government.") (internal citation omitted).  The government is aware of its continuing duty to disclose and will comply with that duty.

### D.   Motion for Disclosure of Rule 404(b) Evidence (Dkt. #53)

Defendant has moved for an order requiring the government to give notice of its intention to introduce evidence of other crimes, wrongs, or acts pursuant to Fed. R. Evid. 404(b) at least four weeks before trial. The government acknowledges its obligation to give notice under Rule 404(b) and will submit notice no later than two weeks prior to trial, or at a time set by the Court, of the nature of any evidence then

known to the government that the government intends to introduce at trial pursuant to this rule.

The Court should deny the motion to the extent that it demands notice beyond what is required by Rule 404. The rule mandates neither a specific form of notice nor a particular period in which to provide it. Fed. R. Evid. 404 advisory committee's note to 1991 amendments. The proposed two-week period provides "reasonable notice" of the use of this evidence prior to trial as required. Moreover, any order should be limited to "notice of the general nature" of the evidence intended for use at trial. Fed. R. Evid. 404 advisory committee's note to 1991 amendments ("The Committee does not intend that the amendment will supercede other rules of admissibility or disclosure, such as the Jencks Act, 18 U.S.C. §3500, et seq. nor require the prosecution to disclose directly or indirectly the names and addresses of its witnesses, something it is currently not required to do under Federal Rule of Criminal Procedure 16.").

### E.   Motion for Disclosure of Informants and Witnesses (Dkt. #54)

Jaberian has moved for an order requiring the government to disclose the identity and addresses of any informants and cooperating individuals who were working with law enforcement during the investigation. The government did not utilize any confidential informants or cooperating witnesses whose identities are unknown to the defendants as contemplated in *Rovario v. United States*, 353 U.S. 53, 59 (1957). Therefore the motion should be denied as moot.

**F.      Motion for Early Disclosure of Jencks Act Material and Grand Jury Disclosure (Dkt. ##56-57)**

The United States objects to defendants' motions requiring the government to disclose all Jencks Act materials at least one month before trial. "By the Jencks Act, after a government witness has testified, the court, upon motion of the defendant, shall order the government to produce any statement of the witness that relates to the subject matter of the testimony and is in the government's possession." *United States v. Sturdivant*, 513 F.3d 795, 803 (8th Cir. 2008) (citing 18 U.S.C. § 3500(b)); *accord* Fed. R. Crim. P. 26.2(a) (providing for disclosure upon demand, after the witness has testified on direct examination). While the United States may voluntarily turn over Jencks Act materials (or Rule 26.2 materials) in advance of hearings or trial, neither the Jencks Act nor Rule 26.2 provides any basis for ordering the same. *See, e.g., United States v. White*, 750 F.2d 726, 729 (8th Cir. 1984) ("Although in many cases the government freely discloses Jencks Act material to the defense in advance of trial, the government may not be required to do so."); *United States v. Alexander*, 736 F. Supp. 968, 981 (D. Minn. 1990) (same). As a result, the motions should be denied.

As a practical matter, the government will negotiate with defense counsel regarding the disclosure of Jencks material in advance of trial.

G.    **Motion for Government to Retain Rough Notes (Dkt. #58)**

The government does not object to requiring the law enforcement officials involved in the investigation of this case to retain and preserve their rough notes and has already instructed the agents to do so.

III.    **MOTION FOR SEVERANCE (DKT. ##60-61)**

Jaberian asks the court to sever him from his co-defendants pursuant to Rule 14 of the Federal Rules of Criminal Procedure. He argues that severance is appropriate because (a) he and Miller's anticipated defenses are inconsistent and irreconcilable and (b) the jury would have difficult separately considering the evidence against him and his co-defendants. Neither of these are grounds for a severance.

The Eighth Circuit has repeatedly held that "[w]hen defendants are properly joined, there is a strong presumption for their joint trial, as it gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome." *United States v. Lewis*, 557 F.3d 601, 609 (8th Cir. 2009) (quoting *United States v. Adkins*, 842 F.2d 210, 211 (8th Cir. 1998); *United States v. Darden*, 70 F.3d 1507, 1528 (8th Cir. 1995)). To overcome this presumption a defendant must show prejudice that is "severe or compelling." *United States v. Crumley*, 528 F.3d 1053, 1063 (8th Cir. 2008). "It is not enough that a defendant thinks his chances for acquittal would be better in a separate trial." *United States v. Delpit*, 94 F.3d 1134, 1143 (8th Cir. 1996) (citing *Zafiro v. United States*, 506 U.S. 534, 540 (1993)). To demonstrate the type of severe or compelling prejudice necessary to overcome the presumption in favor of joint trials, a defendant must show that "(a) his defense is

irreconcilable with that of a co-defendant or (b) the jury will be unable to compartmentalize the evidence as it relates to the separate defendants." *United States v. Mickelson*, 378 F.3d 810, 818 (8th Cir. 2004); *see also Lewis*, 557 F.3d at 609. Such prejudice rarely rises to a level requiring severance. *United States v. Kirk*, 528 F.3d 1102, 1107 (8th Cir. 2008). Instead, "[t]he Supreme Court has made it clear that the risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions." *Delpit*, 94 F.3d at 1144 (citing *Zafiro*, 506 U.S. at 540-41).

The possibility that one defendant may attempt to point the finger at another defendant at trial is not grounds for a severance. It is not uncommon for co-defendants to blame each other at trial. "Mutually antagonistic defenses are not prejudicial per se." *United States v. Nichols*, 416 F.3d 811, 816 (8th Cir. 2005) (quoting *Zafiro*, 506 U.S. at 538). The Eighth Circuit has repeatedly held that such blame shifting and finger pointing is not grounds for a severance. *See, e.g.*, *Zafiro*, 506 U.S. at 540-41 (holding that co-defendants who were accusing each other of the crime were not entitled to a severance); *Nichols*, 416 F.3d at 817 ("Blame-shifting on the part of the defendants 'is not a sufficient reason for a severance.'") (quoting *United States v. Basile*, 109 F.3d 1304, 1310 (8th Cir. 1997)); *Lewis*, 557 F.3d at 609 ("The mere fact that one defendant tries to shift blame to another defendant does not mandate separate trials, as a codefendant frequently attempts to 'point the finger,' to shift the blame, or to save himself at the expense of the other."). Rather, "[a]ntagonistic defenses require severance only when 'there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'" *Delpit*,

94 F.3d at 1143 (quoting *United States v. DeLuna*, 763 F.2d 897, 921 (8th Cir. 1985); *see also United States v. Blankenship*, 382 F.3d 1110, 1125 (11th Cir. 2004) ("The Supreme Court has held that co-defendants do not suffer prejudice simply because one co-defendant's defense directly inculpates another, or it is logically impossible for a jury to believe both co-defendant's defenses.").

Such danger is not present in this case. Jaberian indicates that his defense will be that Miller tricked him into unwittingly participating in the hijacking scheme. He further suggests that Miller would likely claim that the scheme was not technically illegal at all. These defenses are not logically inconsistent. A jury could well believe that Miller tricked Jaberian into participating in his hijacking scheme, while also concluding that the scheme was not fraudulent or illegal. Accordingly, severance is not necessary because there is no reason to believe a jury would conclude that this conflict alone demonstrates they both are guilty.

In *Nichols*, the Eighth Circuit affirmed the denial of a severance motion based on similar facts. The co-defendants were charged with being involved in a fraud involving the sale of fake cars from a fictitious probate estate. Defendant-1 claimed that he knew nothing of his co-defendant's estate or scheme to fraudulently sell fake cars. On the other hand, defendant-2 claimed he was duped and misled by defendant-1, who he claimed masterminded the entire scheme. The Eighth Circuit concluded that the defenses were not irreconcilable and that severance was not warranted. *Id.* at 816-17.

Similarly, in *Lewis*, the Eighth Circuit concluded that severance was not required where one defendant claimed at trial that he had no knowledge of the charged fraud scheme and had relied in good faith on his co-defendant's representations:

> Although Tyron Lewis's counsel did argue at trial that Tyron Lewis had been ignorant of Cameron Lewis's misconduct and had relied on Cameron Lewis's representations, the crux of Tyron Lewis's defense was that the government failed to prove that he intended to defraud anyone, was aware of any crimes, or agreed to commit any crimes. This defense was not actually irreconcilable with Cameron Lewis's defense that no fraud was committed.

*Lewis*, 557 F.3d at 610. Despite the inconsistencies in these defenses, the court concluded "the jury could weigh the evidence against each defendant in relative isolation and reach independent verdicts as to the guilt of each, accepting or rejecting their separate defenses to the specific charges against them." *Id*; *see also Delpit*, 94 F.3d at 1143 (fact that defendant in multi-defendant drug trial testified that he was a drug dealer and not a killer "did not put [his co-defendants] in a good light" but was not grounds for a severance).

Here, too, there is no reason to believe a properly instructed jury will be unable to assess the evidence against Jaberian independent of his co-conspirators and accept or reject his defenses to the charges against him.

Jaberian also claims a severance is necessary because the jury would not be able to "compartmentalize" the evidence against the various defendants. This argument fails for two reasons. First, Jaberian is charged with conspiracy to commit securities fraud and is therefore responsible for the actions his co-defendants took in

12

furtherance of the scheme. *Delpit*, 94 F.3d at 1152 ("The acts of the principal become those of the aider and abettor as a matter of law."). Second, the fact that the evidence may be stronger against some defendants than others is not grounds for a severance. *See, e.g.*, *United States v. Hively*, 437 F.3d 752, 765 (8th Cir. 2006) ("Severance is never warranted simply because the evidence against one defendant is more damaging than that against another, even if the likelihood of the latter's acquittal is thereby decreased."); *Bordeaux*, 84 F.3d at 1547 ("Disparity in the weight of the evidence between the codefendants is not a sufficient reason for severance."); *United States v. Blum*, 65 F.3d 1436, 1444 (8th Cir. 1995) ("A severance, however, is not required merely because the evidence against one defendant is more damaging than the evidence against another."). This is so even where "evidence that is admissible only against some defendants may be damaging to others." *Mickelson*, 378 F.3d at 818 (citing *United Blum*, 65 F.3d at 1444).

The concerns Jaberian raises about a joint trial are best dealt with "careful and through jury instructions." *Delpit*, 94 F.3d at 1144 (citing *Zafiro*, 506 U.S. at 540-41) The Eighth Circuit pattern instructions cover many of the issues raised in his motion. *See, e.g.*, 8th Circuit Model Instruction 3.08 ("Keep in mind that you must give separate consideration to the evidence about each individual defendant. Each defendant is to be treated separately . . ."); 2.14 ("You may consider some of the evidence in this case only against defendant (name); you may not consider that evidence against the other defendant[s]."). There is no reason to believe a properly

instructed jury will not be able to fairly consider the evidence against Jaberian, as well as his proffered defenses. Accordingly, his motion to sever should be denied.

## IV.   CONCLUSION

Based on the foregoing, the government respectfully requests that defendant Jaberian's motions be denied.

Respectfully Submitted,

Dated:  September 7, 2021                    W. ANDERS FOLK
                                             United States Attorney


                                             /s/ Joseph H. Thompson
                                  BY:   JOSEPH H. THOMPSON
                                        MIRANDA E. DUGI
                                        Assistant U.S. Attorneys

14