UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-142(2) (DSD)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) **GOVERNMENT'S POSITION** |
|  | ) **REGARDING SENTENCING** |
| SAIED JABERIAN, | ) |
| Defendant. | ) |

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Joseph H. Thompson, Assistant United States Attorney, submits the following sentencing memorandum and respectfully requests that the Court impose a sentence of 2 years of probation.

**I.  BACKGROUND**

Saied Jaberian aided and abetted a pump-and-dump stock manipulation scheme. His co-conspirators carried out a scheme to surreptitiously hijack and assume control over dormant public shell companies. After taking control of the companies, they issued fraudulent press releases and public filings designed to pump up the stock price. The conspirators then dumped their stock at the fraudulently inflated prices.

**A.  Pump-and-Dumps and Dormant Shell Companies**

Generally, a pump-and-dump is a scheme to inflate a stock's price based on false, misleading, or fraudulent information. Participants in the scheme acquire

shares of the stock at low prices, artificially inflate the price of the stock, then sell their shares at the inflated price.

The particular pump-and-dump scheme involved the hijacking of dormant public shell companies. Dormant public shells are publicly traded companies without active operations. Most of them have been abandoned by their management, stopped filing their required Securities and Exchange Commission (SEC) and secretary of state filings, and often have revoked registration.

Dormant public shells remain publicly traded on the over-the-counter (OTC) markets. These stocks generally trade for fractions of a penny per share—often $0.0001 per share. They are thinly traded, with very few shares trading on any given day. As a result, dormant public shells are ripe for manipulation through pump-and-dump schemes. In the words of the SEC, "empty shell companies are to stock manipulators and pump-and-dump schemers what guns are to bank robbers—the tools by which they ply their illegal trade."

### B.  The Shell Hijacking Scheme

Mark Miller and Christopher Rajkaran were active traders and promoters of OTC stocks. Miller lived in Minnesota and Rajkaran lived in Queens, New York. Both Miller and Rajkaran had large followings on Twitter and iHub.com, a popular website devoted to penny stocks and the OTC market. They used those platforms to promote penny stocks.

In 2017 and 2018, Miller and Rajkaran participated in a scheme to identify and hijack dormant public shell companies for use in pump-and-dump schemes. They used a four-step process to hijack and manipulate a shell company's stock.

First, Miller, Rajkaran, and their co-conspirators bought stock in the shell company (or "frontloaded") at low prices in the public markets. They were able to obtain hundreds of thousands or even millions of shares given the penny stocks' extremely low prices.

Second, Miller, Rajkaran, and their co-conspirators took control over the shell companies through fraudulent public filings. They did this by creating fake resignation letters and board minutes announcing the resignation of the prior corporate officers and the appointment of the conspirators as the new officers and directors of the company. They used these fake documents to reinstate the companies' corporation registration. These new secretary of state documents listed the conspirators as the corporate officers and directors. They used these new, fraudulently obtained corporate registration documents to change the password for the companies' account on the SEC's EDGAR website, which allowed them to make public filings on behalf of the company.

Third, Miller, Rajkaran, and their co-conspirators issued fraudulent press releases and SEC filings to pump up the stock price. The press releases or reports announced market-moving information, such as a potential merger or new business opportunity. At the same time, they promoted and pumped up the stock price via Twitter and posts on investorhub.com, a website with a popular message board devoted to penny stocks.

Finally, Miller, Rajkaran, and their co-conspirators sold (or "dumped") their shares at the fraudulently inflated stock price. This mass selling generally trashed

the stock price, leaving unsuspecting investors holding nearly worthless shell company stock.

### C. Jaberian's Role in the Scheme

Miller and Rajkaran hijacked multiple public shell companies, including Bell Buckle Holdings Inc. (OTC: BLLB), Encompass Holdings Inc. (OTC: ECMH), and Utilicraft Inc. (OTC: UITA). Saied Jaberian participated in the hijacking of one of these companies—Bell Buckle Holdings. As part of the scheme, Jaberian and his co-conspirators bought stock in Bell Buckle Holdings at low prices in the OTC market. Jaberian was able to obtain millions of shares because the stock traded at only a fraction of a penny per share.

After buying stock in Bell Buckle Holdings, Miller and Rajkaran hijacked and took control of the company by creating and filing fake resignation letters and board minutes purporting to announce the resignation of the prior corporate officers and the appointment of Jaberian as the new President and CEO. Jaberian then submitted a request for access to the companies' accounts with the SEC's Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system, which allowed them to make public filings on behalf of the company.

Jaberian then provided information used to draft a press release announcing him as the CEO of Bell Buckle Holdings. The press release, which was later edited and expanded on by Miller and others, contained false statements about Jaberian's background and his intent to run Bell Buckle Holdings as an import/export business involved in bulk leather sales. Miller and Rajkaran used this press release to fraudulently inflate, or "pump up," the price of Bell Buckle Holdings stock.

Unlike Miller and Rajkaran, Jaberian was not a stock promoter. He was not active on iHub and other OTC websites. While Jaberian remained willfully blind of the full nature of the scheme, he benefited from and took advantage of it by selling his stock at the fraudulently inflated prices. Jaberian made a profit of approximately $67,034 from his stock sales.

### D. The Plea Agreement and Guidelines Range

Jaberian pled guilty to one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, 17 U.S.C. § 240.10b-5, and 18 U.S.C. § 2. The PSR correctly calculated the Guidelines range to be 0 to 6 months in prison.

## II. GOVERNMENT'S SENTENCING RECOMMENDATION

Based on a review of the § 3553(a) factors, the government recommends that the Court impose sentence Jaberian to 2 years of probation.

Jaberian played a minor role in a complex securities fraud scheme. His co-conspirators Mark Miller and Christopher Rajkaran were active penny stock traders and promoters. They concocted and carried out a scheme to hijack and assume control over shell companies and use their control to carry out a pump-and-dump scheme. Jaberian aided and abetted this fraud scheme by allowing his co-conspirators to appoint him as the "new" CEO of the Bell Buckle Holdings. This allowed his co-conspirators to assume control of the company and issue fraudulent and misleading public filings on behalf of the company.

Jaberian should have known better. Though he was not an active penny stock promoter like Miller and Rajkaran, he knew his friends were up to no good. But he went along with it, let them use his name and family story for their bogus press

release, and took advantage of their efforts to profit from his own fraudulent stock trading. It was mistake. And it was a crime. That being said, Jaberian's role in the scheme was limited. He did not participate in the fraudulent stock promotion. And he did not participate in his co-conspirators efforts to hijack other companies.

Jaberian's participation in the scheme lasted about two weeks in February 2018—more than five years ago. Outside of that period, Jaberian has otherwise lived a productive and law-abiding life. In light of age of the conduct, and Jaberian's limited participation in the scheme, the government believes two years of probation is sufficient, but not greater than necessary, to comply with the § 3553(a) factors.

### III. CONCLUSION

For the reasons stated above, the Government respectfully requests that the Court impose a sentence of 2 years of probation.

Dated: March 22, 2023							Respectfully Submitted,

									ANDREW M. LUGER
									United States Attorney

									/s/ *Joseph H. Thompson*
								BY:	JOSEPH H. THOMPSON
									Assistant U.S. Attorney